# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

MICHAEL WADE,

    Plaintiff,

    v.

SOO LINE RAILROAD and CANADIAN
PACIFIC RAILROAD COMPANY,

    Defendants.

No. 03 C 3922
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

This case began as a fairly routine workers' compensation suit against Defendants Soo Line Railroad ("Soo Line") and Canadian Pacific Railroad Company ("Canadian Pacific"). Plaintiff Michael Wade claimed he sustained an injury to his shoulder while working as a switchman when a hand brake malfunctioned, causing a collision. After the accident, Plaintiff engaged Hoey & Farina lawyer George Brugess to represent him against the railroad. Brugess has a good deal of experience in these types of cases; he has worked almost exclusively in railroad cases for the last twenty years representing both railroads and their employees.

In December 2004, this case took an unusual turn. While Soo Line's attorney, Daniel Mohan, was taking the deposition of Plaintiff's treating physician, Dr. Kim of Treister Orthopedic Services ("TOS"), he noticed that the file she was holding was somewhat larger than the one he received during discovery. Mohan asked Dr. Kim to pass Plaintiff's file to him so that he could inspect its contents. Much to his surprise, Mohan found several proverbial "smoking-guns" in the file that had not been previously produced. After discovering these documents, Mohan became slightly agitated and demanded that the documents be copied for him. Mohan

marked the documents he wanted copied with paper clips and showed them to Brugess who was also present at the deposition. Dr. Kim reluctantly agreed to have a clerk in her office copy the stack of marked documents. The copied documents were brought back into the room about thirty minutes later. Mohan testified that he reviewed the copied documents and found at least two if not three of the "smoking gun" documents were missing. *Mohan Direct Test. p.31*. He claims he asked to see the original file again and, despite a thorough page-by-page review, could not find the missing documents even among the originals. *Id.* Mohan then questioned Brugess about all of the missing documents. *Id.* at 36. Brugess, however, replied that he did not know which documents Mohan was referring to and eventually came to the conclusion Mohan was looking for one document containing an independent medical evaluation ("IME") done by Dr. Kim's boss, Dr. Treister. *Brugess Direct Test. p. 20.* That document is Exhibit H here.

As the search for the missing documents went on, the mood in the room became increasingly tense. Brugess claims that Mohan became combative with him and Dr. Kim, causing Brugess to end the deposition. *Id.* at 21-22. Before ending the deposition, Brugess found Exhibit H and had a copy made for Mohan. *Id.* at 23. While Mohan was interested in Exhibit H, there were two other documents he felt were more important that were never returned to the deposition room. These are Exhibits F and G here.

On December 30, 2004, the day after Dr. Kim's deposition, Mohan subpoenaed the depositions of all staff members on duty the previous afternoon and of Dr. Kim for January 10 and 11, 2005. In the deposition rider, Mohan described the contents of the missing documents as best he could from memory. On January 4, 2005, unbeknownst to Mohan, TOS faxed the two missing documents, along with the recently issued subpoenas to Brugess at his office. Instead of

2

forwarding these documents on to Mohan, Brugess sent a letter on January 6, 2005, indicating that he would be on trial during the next week and would need to continue the depositions to a later date. Brugess stated further that Dr. Kim would be writing a letter to my chambers detailing Mohan's "erratic behavior at her first deposition, including the false accusations [he] leveled against her." *Plaint. Ex. L.*

On January 7, 2005, Mohan filed an Emergency Motion for a Protective Order to prohibit TOS from destroying the missing documents. In that motion, Mohan described the two missing document as:

> type written notes, in small type, apparently generated on a computer, which detailed specific conversations between Mr. Brugess and Dr. Treister ("Notes"). The Notes stated that a member of Treister Orthopedic Services had a conversation with Mr. Brugess wherein the author expressed a concern that Treister Orthopedic Services would not be paid for their services regarding Plaintiff's case. The Notes quoted Mr. Brugess as suggesting that his law firm would pay for the services directly to the doctor. The author then stated that he expressed to Mr. Brugess a concern regarding a "risk of liability (fraud)" to which Mr. Brugess responded that this is done all the time and not to worry. Also included in computer-generated Notes were Dr. Treister's impressions that Plaintiff had no disability and no physical finding of any injury or medical condition. The Note stated that the author, presumed to be Dr. Treister, wanted to communicate to Mr. Brugess that he did not know how he could help in this case, and if Mr. Brugess had any ideas, he would like to hear them.

*Def. Ex. M.*

In an Order dated January, 10 2005, I granted the motion. A copy of that Order was sent to TOS and Brugess on January 13, 2005.

Brugess finally forwarded Exhibits F and G to Mohan on January 25, 2005. The documents are very similar to Mohan's description. Exhibit F is labeled as a "Collections System Detail Report" and contains two statements which would be of interest to Mohan. The

3

first says that "[p]atient was referred to [TOS] by Atty Downes office." This is different from previously produced documents indicating Plaintiff had been referred by a friend. The second is a note stating:

> Atty Brugess called, states he is aware that we are just making penny for a dollar billed thru United Health which we have a contract with, he make a proposal to bill him for the balance showing that we did review of record for such $ amt. then he will include that in the settlement or pay us up front for that charge. Asked him for the risk that we might encounter (fraud) in the future. He states it happened so many times, & that is the only way we will get our bills paid in full. He will provide the proper documentation like he will request for record review then we charge him & he will pay.

*Def. Ex. F.*

Exhibit G is a letter, authored by Dr. Treister, asking Martha, a TOS employee, to call Brugess and read him an "unofficial note." The note states, among other things, that Plaintiff's shoulder is not showing any signs of continued injury and asks "how do I indicate disability when basically examination is normal and there is no atrophy or any other really objective finding." *Def. Ex. G.* It also says "I just don't think there is anything that I can write down which would be helpful rather than harmful. Does George Brugess have any ideas...This note can be stapled unofficially to the outside of the chart. It is NOT a report and NOT a progress note." *Id.*

Defendant Soo Line now asks that I sanction Brugess for failing to disclose documents which were vital to Mohan's defense and for improperly attempting to make direct payment of bills to TOS. I examine first the more serious accusation that Brugess attempted to pay TOS for their services instead of submitting bills to United Healthcare or applying them to a settlement amount. The line in Exhibit F asking about fraud and suggesting that TOS bill him directly led Mohan to suspect Brugess of making direct payments to TOS. *Def. Ex. F.* When put in its proper context, however, Exhibit F does not suggest the direct payment of medical treatment.

Rather, it almost certainly refers to payment for a document review or independent medical examination ("IME"). In her note, the author, Lerma Saringo, states "[Brugess] make a proposal to bill him for the balance showing that we did review of record for such $ amt. then he will include that in the settlement or pay us up front for that charge." *Id.* Here, the "pay us up front" is referring to the charges for the "review of records."

TOS's billing statements and the documented payments made by Hoey & Farina during the relevant time support this interpretation. Saringo's note of June 9, 2003 is the first reference we have to Dr. Treister preforming a document review and/or IME. The document review and/or IME next appears on July 7, 2003 as a charge of $3,200 labeled document review on a TOS invoice. *Ramos Dep., Ex. 2; Def. Ex. S.*[1] Dr. Treister testified that he probably performed a document review and then set-up an appointment for the Plaintiff sometime in the next three months. *Treister Test. p. 15-18.* An appointment for the Plaintiff to see Dr. Treister for an IME, on January 8, 2004, was confirmed by a letter dated November 6, 2003. *Def. Ex. I.* The letter was written by Brugess and stated that additional medical records were enclosed and that a check for $532 would be sent under separate cover. *Id.* That check was dated November 6, 2003 and was applied to Plaintiff's bill on November 18, 2003. *Ramos Dep. Ex. 2.* This $532 payment

---

[1] Much has been made of the excessive amount of this charge. However, I don't find it significant to my decision on the instant motion for sanctions. First, this charge was never paid by Brugess or his law firm, Hoey & Farina. Brugess actually forwarded a bill, which included the document review as well as other medical charges, to the Michael Schmidt at Casualty Management Dept. of Canadian Pacific who denied payment. *See Def. Ex. S.* This is not exactly the kind of behavior one would expect from a lawyer trying to hide an under-the-table payment. Second, all of the TOS employees and Dr. Treister himself have testified that the bill was a clerical error. *See Ramos Dep. p. 14-18; Saringo Dep. p. 73; Treister Dep. p. 16.* That testimony may or may not have been true but there was no testimony that TOS Brugess had offered to make up the insurance shortfall with a phony charge for records review. At worst, TOS personnel may have attempted to do this on their own.

plus two other relatively small payments for production of documents are the only direct payments made from Hoey & Farina to TOS. *See Plaint. Ex. 4.; Ramos Dep. Ex. 2.*

The record further shows that Plaintiff kept his January appointment with Dr. Treister.[2] In fact, that examination led to the creation of the two most damaging documents Mohan uncovered at Dr. Kim's deposition, Exhibits G and H. Offering Dr. Treister the opportunity to perform a document review and/or an IME was certainly an unsavory "sweatening of the deal." It was not per se improper. What would likely be improper is the direct offer to pay an excessive fee for a records review say, in the exact amount of uninsured medical fees for treating Plaintiff. Dr. Treister may have so interpreted the offer but it is not the offer Brugess actually made. According to the record before me, the only direct payments made by Hoey & Farina to TOS are the $532 for a document review, $28.25 for production of medical records, and $51.52 for production of medical records. Since these fees are related to legal and not medical services, I find that their direct payment was not improper.

Next, Defendant Soo Line argues Brugess improperly failed to disclose that Dr. Treister evaluated Plaintiff on January 8, 2004 and failed to disclose the documents containing Dr. Treister's findings, i.e. Exhibits G and H. There is no question that Exhibits G and H are damaging to Plaintiff's case. The language of Exhibit G that: "physical examination not diagnostic of any specific ongoing condition...how do I indicate disability when basically examination is normal and there is no atrophy or any other really objective findings?" is the sort

---

[2] There is a discrepancy in the date of the evaluation between Defendant's Exhibit G and H. Exhibit G indicates the IME took place on January 6, 2004 and Exhibit H indicates the IME took place on January 8, 2004. I note the difference, but do not find it material to my decision here. *See Def. Exs. G & H.*

that often appears in defense expert reports. *Def. Ex. G.* And Exhibit H is similar: "I do not see any muscle atrophy about the left shoulder. Physical examination shows a full range of motion of the left shoulder.. I do not on physical examination see any evidence of objective pathology." *Def. Ex. H.*

Brugess argues that he did not need to disclose the evaluation or its results because the evaluation was an IME done by a consulting physician that he (especially after hearing the results) did not intend to offer at trial. *Brugess Test. p. 14.* But, I reject this. Looking at Dr. Treister's involvement with this case, Brugess could not reasonably have thought of him as merely a consulting expert. First, Dr. Treister was disclosed as a treating physician in Plaintiff's Answers to Interrogatories and in the Attachments to Plaintiff's Rule 26 Disclosures. *Def. Ex. D p. 3; 12.* Additionally, Dr. Treister is the sole owner of TOS and is Dr. Kim's direct supervisor. Accordingly, I find that Brugess was required to disclose any treatment or reports made by Dr. Treister, including both Exhibits G and H.

Finally, Defendant Soo Line argues that Brugess improperly withheld documents contained in Defendant's Exhibits E through I. These are the documents that Mohan identified as undisclosed during Dr. Kim's deposition and asked be copied. Dr. Kim objected to the production of these documents on the grounds that they were internal documents and records. *Kim Test. p. 101.* Despite her objections, Dr. Kim reluctantly agreed to copy the documents. However, only the documents contained in Exhibits E, H, and I were actually copied and given to Mohan by the end of the deposition. Exhibits F and G were not copied and became the subject of the protective order.

Briefly, Exhibit E is a form filled in by Plaintiff in which he was asked "do you feel that another party is responsible for this accident" and answered "no." Exhibit E actually looks like the kind of internal document that TOS may not routinely disclose. Since this is probably the case, it is unlikely that Brugess was aware Exhibit E existed and probably cannot be blamed for its late production. Exhibit I is Brugess's request for the IME that ultimately appears in Exhibit H. As discussed above, Brugess was required to disclose documents relating to any treatment performed by Dr. Treister–that would certainly include Exhibit H and would also include the information contained in Exhibit I.

Much like Exhibit E, Exhibits F and G were probably considered as internal documents and were not, as Brugess testified, disclosed to him before Dr. Kim's deposition. *Brugess Test. p. 34.* Exhibit F is a billing document containing notes made by Saringo and Exhibit G is a note asking a TOS employee to contact Brugess and explain that the Plaintiff's shoulder appeared normal. After he discovered that Exhibits F and G were missing, Mohan claims that he repeatedly asked Brugess to help him find them and that Brugess, despite knowing otherwise, insisted that he was looking only for Exhibit H, which was a less damaging document and which was found and copied before the end of the deposition. *Mohan Test. p. 33-40.* The transcript from Dr. Kim's deposition, however, shows that Mohan was not clearly articulating what and how many documents were missing. Mohan's lack of clarity is not surprising given the circumstances. Mohan described the missing documents in the following ways:

> "a record from Dr. Treister concerning an IME that was scheduled with Mr. Brugess and Dr. Treister's opinion on that"; "Dr. Treister did the IME. There is a record of his findings"; "there was a record here of Dr. Treister's examination and evaluation of the patient, and IME"; "Dr. Treister...had opined concerning plaintiff's lack of disability, no findings of any objective physical findings and a variety of other things that were extremely harmful to the plaintiff's case"; "it is a

8

document where Dr. Treister is giving an opinion"; and "[Dr. Treister] did an IME in this case and his records and opinions were in your file."

*Def. Ex. B p. 31-37.*

It is possible to see how Brugess could have thought Mohan was referring to Exhibit H. Although some of the descriptions more closely depict Exhibit G, had Brugess not read Exhibit G carefully, especially its last two paragraphs, it might not have resonated with him. Furthermore, none of Mohan's descriptions match Exhibit F.

This possible lack of knowledge and/or understanding, however, does not excuse Brugess's later actions. On December 30, 2004, the day after Dr. Kim's deposition, Mohan served a subpoena on TOS asking for production of Plaintiff's entire file, making specific reference to documents concerning the IME and bills sent to Hoey & Farina. *Def. Ex. J.* On January 4, 2005, TOS responded by faxing the subpoena along with Exhibits F and G to Brugess. Brugess acknowledges receiving this fax but claims he did not have time to review it because of an upcoming trial. *Brugess Test. p. 61-62.* Despite not having time to review and forward Exhibits F and G, which amount to a scant three pages, Brugess did have time to write Mohan a letter on January 6, 2005, telling Mohan that he should not contact TOS directly and that he would have to reschedule the requested depositions. *Def. Ex. L.* The letter also stated that Dr. Kim would be writing a letter to me detailing Mohan's "erratic behavior." *Id.*

The January 6, 2005 letter demonstrates that Brugess had not only read the subpoena but had also been in contact with TOS. In light of his response, I find Brugess's claims that he was too busy to review and send three pages worth of highly poignant documents utterly unconvincing. Brugess is an experienced FELA attorney who recognized the importance of these documents to the defense. *Brugess Test. p. 65.* If the faxed documents were not enough to get

9

his attention, the point should have been brought home when he received a copy of Defendant Soo Line's motion for a protective order in which Mohan accurately described Exhibits F and G. *Def. Ex. M.* Accordingly, I find that it was improper for Brugess to continue to withhold Exhibits F and G for almost another three weeks after receiving them from TOS.

For these reasons, I find that Brugess's failure to disclose Dr. Treister's IME and the relating documents as well as Brugess's failure to promptly produce Exhibits F and G, especially given their importance to the defense, violated Fed. R. Civ. P. 37. Pursuant to my authority under Rule 37 to sanction such behavior, I order the case be dismissed and all attorneys' fees be paid by Brugess. I do not think this dismissal will materially prejudice Plaintiff. Given the documents uncovered by Mohan, the grant of summary judgment for Soo Line is almost a forgone conclusion. To the extent Plaintiff has been injured, he is free to pursue a claim against Brugess.

Defendant's Motion for Sanctions is GRANTED.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: August 22, 2005